**No. 19-15707**

# In the United States Court of Appeals for the Ninth Circuit

KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,
on behalf of themselves and all individuals similarly situated,

*Plaintiffs-Appellees*,

v.

PLAIN GREEN LLC,

*Defendant,*

and

HAYNES INVESTMENTS, LLC, and L. STEPHEN HAYNES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California at San Francisco

## BRIEF FOR PLAINTIFFS-APPELLEES

KRISTI C. KELLY
ANDREW J. GUZZO
KELLY GUZZO, PLC
3925 Chain Bridge Rd., Suite 202
Fairfax, Virginia 22030
(730) 424-7527

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
1900 L St. NW, Suite 312
Washington, DC 20036
(202) 888-1741

*Counsel for Plaintiffs-Appellees (additional counsel listed on inside cover)*

February 3, 2020

LEONARD A. BENNETT
CRAIG C. MARCHIANDO
ELIZABETH W. HANES
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1A
Newport News, Virginia 23601
(757) 930-3660

ANNA C. HAAC
TYCKO & ZAVAREEI LLP
1828 L St. NW, Suite 1000
Washington, DC 20036
(202) 973-0900

# TABLE OF CONTENTS

Table of authorities ................................................................. ii

Introduction ......................................................................... 1

Jurisdictional statement ........................................................ 4

Statement of the issue ........................................................... 4

Statement of the case ........................................................... 4

Standard of review ............................................................... 14

Summary of argument .......................................................... 14

Argument ............................................................................ 18

    I.    The contracts are unenforceable because, by their terms,
they forbid the application of state and federal law. ........... 18

        A.    The contracts are invalid under the FAA because they
prospectively waive a consumer's statutory rights. .................. 19

        B.    The existence of other (inadequate) remedies under tribal
law does not save the contracts. ................................. 28

        C.    The choice-of-law clause cannot be read in isolation and
does not save the contracts. ...................................... 33

        D.    The presence of a delegation clause does not make the
contracts enforceable. ............................................. 38

        E.    The district court's decision invalidating the contracts was
not premature. ..................................................... 42

    II.    Enforcing these contracts would invite a race to the bottom. ............ 46

Conclusion .......................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*14 Penn Plaza LLC v. Pyett,*
  556 U.S. 247 (2009) .................................................................20

*Aggarao v. MOL Ship Management Company, Ltd.,*
  675 F.3d 355 (4th Cir. 2012) ...................................... 24, 38

*American Express Co. v. Italian Colors Restaurant,*
  570 U.S. 228 (2013) ........................................ 16, 19, 20, 21

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) .................................................................20

*Consumer Financial Protection Bureau v. CashCall, Inc.,*
  2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ........................7

*Dillon v. BMO Harris Bank, N.A.,*
  856 F.3d 330 (4th Cir. 2017) ..............................................*passim*

*Gilmer v. Interstate/Johnson Lane Corp.,*
  500 U.S. 20 (1991) ..................................................................20

*Gingras v. Think Finance Inc.,*
  922 F.3d 112 (2d Cir. 2019) ................................................*passim*

*Graham Oil Co. v. ARCO Production Co.,*
  43 F.3d 1244 (9th Cir. 1994) ..................................... 23, 31

*Green Tree Financial Corp.-Alabama v. Randolph,*
  531 U.S. 79 (2000) .................................................................42

*Hall Street Associates, L.L.C. v. Mattel, Inc.,*
  552 U.S. 576 (2008) ..............................................................47

*Hayes v. Delbert Services Corp.,*
  811 F.3d 666 (4th Cir. 2016) ..............................................*passim*

*Hooters of America, Inc. v. Phillips,*
  173 F.3d 933 (4th Cir. 1999) ...............................................22

*Inetianbor v. CashCall, Inc.,*
  768 F.3d 1346 (11th Cir. 2014) ..................................... 2, 28

*Jackson v. Payday Financial, LLC,*
  764 F.3d 765 (7th Cir. 2014) ...............................................*passim*

*Kindred Nursing Centers Ltd. Partnership v. Clark*,
137 S. Ct. 1421 (2017) ...................................................................20

*Lipcon v. Underwriters at Lloyd's, London*
148 F.3d 1285 (11th Cir. 1998) .................................................. 24, 38

*MacDonald v. CashCall, Inc.*,
2017 WL 1536427 (D.N.J. Apr. 28, 2017) ..................................... 37, 40

*MacDonald v. CashCall, Inc.*,
883 F.3d (3d Cir. 2018) ...........................................................*passim*

*Minnieland Private Day School, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
867 F.3d 449 (4th Cir. 2017) .............................................................43

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)..............................................................*passim*

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ...................................................................21

*Nino v. Jewelry Exchange, Inc.*,
609 F.3d 191 (3d Cir. 2010)........................................................ 18

*Parm v. National Bank of California*,
835 F.3d 1331 (11th Cir. 2016) ........................................2, 28, 40, 42

*Parnell v. Western Sky Financial LLC*,
664 F. App'x 841 (11th Cir. 2016)........................................... 2, 28, 40

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ................................................................... 40

*Richards v. Lloyd's of London*,
135 F.3d 1289 (9th Cir. 1998)................................................... 23, 24

*Smith v. Western Sky Financial, LLC*,
168 F. Supp. 3d 778 (E.D. Pa. 2016) ........................................... 40

*Steelworkers v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960)...................................................................36

*Stolt-Nielsen, S.A. v. AnimalFeeds International Corp.*,
559 U.S. 662 (2010) ...........................................................21, 35, 36

iii

## Statutes

28 U.S.C. § 1331 ................................................................................ 4

28 U.S.C. § 1332(d) ........................................................................... 4

28 U.S.C. § 1367 ................................................................................ 4

9 U.S.C. § 16 ...................................................................................... 4

9 U.S.C. § 2 ................................................................................. 20, 21

9 U.S.C. § 4 ..................................................................................... 25

## Other Authorities

Chippewa Cree Tribal Lending and Regulatory Code § 10-6-201 (2017),
    https://perma.cc/Q4JV-7DR3 ................................................... 33

Guide to State Usury Laws (2014),
    https://perma.cc/BB62-3TGR ..................................................... 6

*In re CashCall, Inc.*, Order to Cease and Desist
    (N.H. Banking Dept. June 4, 2013), 2013 WL 3465250 ......................... 7

*In re First Nat'l Bank*, Order to Cease and Desist Case No. FDIC-07-
    256b (Oct. 9, 2008), https://perma.cc/D6JT-LQAN ..................... 6

*In re Great Plains Lending, LLC*, Order to Cease and Desist
    (Ct. Dept. of Banking Jan. 6, 2015), https://perma.cc/NN2C-4LF2................ 9

N.Y. State, *Cuomo Administration Demands 35 Companies Cease and Desist
    Offering Illegal Online Payday Loans That Harm New York Consumers*
    (Aug. 6, 2013), https://perma.cc/PD3U-X9BE ............................ 9

Otoe-Missouria Tribal Consumer Financial Services Ordinance
    (2018), https://perma.cc/T68B-DJZ4 ....................................... 32

Heather L. Petrovich, *Circumventing State Consumer Protection Laws: Tribal
    Immunity and Internet Payday Lending*, 91 N.C. L. Rev. (2012) .................. 5

Think Finance Settlement,
    https://perma.cc/CQ2Q-4RHG ................................................. 9

## INTRODUCTION

The plaintiffs in this payday lending case are California residents who were lured into obtaining payday loans from Plain Green and Great Plains—two online lending websites created and run by the defendants. Even though California caps interest on loans at 10% APR, the plaintiffs' loans carried triple-digit interest rates up to nearly 450%—more than 45 times the legal limit.

This appeal concerns the defendants' effort to contract their way out of legal accountability. To evade courts and regulators, the operation did its lending over the Internet and sought to cloak the scheme in immunity through tribal-arbitration contracts. By their terms, the contracts (1) expressly disavow the application of federal and state law to any dispute, (2) specifically forbid an arbitrator from applying any of the relevant law governing a consumer's claims, and (3) strip a federal court of any ability to review either the arbitration or the contract.

These contracts have been called an "integrated scheme to contravene public policy" and a "brazen" attempt to avoid federal and state laws. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016). Although the defendants in this appeal—a Texas businessman and his company which actually funded and facilitated the lending operations—are not tribal entities and do not make any claim of tribal affiliation, they nonetheless seek to renounce wholesale the federal and state laws that would otherwise apply through the enforcement of these contracts. That is invalid

under the Federal Arbitration Act: As the Second Circuit recently explained, these contracts force borrowers "to disclaim the application of federal and state law in favor of tribal law" and so are "both unenforceable and unconscionable." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126–27 (2d Cir. 2019).

The defendants nevertheless insist that the arbitration clause must be enforced. They claim that it reflects little more than a standard provision that courts have "routinely enforced." Haynes Br. 22. But every Court of Appeals that has considered a tribal-arbitration contract has found it unenforceable and refused to enforce it. The Fourth Circuit has twice labeled these sorts of contracts—including a materially identical version of the ones at issue here—a "farce," designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes*, 811 F.3d at 674, 676; *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017). And other circuits have likewise refused to enforce them multiple times. *See MacDonald v. CashCall, Inc.*, 883 F.3d 220 (3d Cir. 2018); *Parnell v. Western Sky Fin., LLC*, 664 F. App'x 841 (11th Cir. 2016); *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331 (11th Cir. 2016); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346 (11th Cir. 2014); *Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014). Just last year, the Second Circuit firmly rejected yet another attempt by members of this same enterprise. *Gingras*, 922 F.3d at 127.

The defendants once again now seek a federal court's aid in salvaging the contracts. But their claim (at 16) that the district court's refusal to enforce these

contracts "runs contrary to a litany of binding authority from the Supreme Court and this circuit" is demonstrably wrong. The district court explicitly followed the unanimous weight of authority holding that these contracts run afoul of the FAA. And the approach taken by the district court here accords with *every* federal court to consider the validity of those contracts employed by the lending scheme at issue here. *See, e.g.*, ER10 (noting that "numerous" courts have "found that the arbitration provisions in similar loan agreements were unenforceable"). In all, two separate circuits and multiple district courts have squarely refused to enforce these contracts. *See, e.g.*, *Gingras*, 922 F.3d at 127 (invalidating a Plain Green contract); *Dillon*, 856 F.3d at 332 (same, for Great Plains); *Gibbs v. Stinson*, 2019 WL 4752792 (E.D. Va. Sept. 30, 2019) (same, for both); *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901 (E.D. Va. 2019) (same, for both).

This Court should affirm. The contracts are invalid because they are "designed to avoid federal and state consumer protection laws." *Gingras*, 922 F.3d at 127. It is a fundamental principle of the FAA that enforcing a contract forcing consumers to prospectively waive their rights would seriously jeopardize, rather than promote, the FAA's policy favoring legitimate efforts to negotiate alternative dispute resolution mechanisms. Although the FAA permits parties to forego the legal process and submit disputes to private dispute resolution, often with an eye toward enhancing the simplicity and informality of the matter, it does not allow a contract

to employ arbitration as a means to sacrifice substantive claims. Here, the defendants drafted an arbitration contract "in a calculated attempt to avoid the application of state and federal law," and so the "entire arbitration agreement is unenforceable"— it takes a step "forbidden" by the FAA. *Dillon*, 856 F.3d at 337, 334.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1367. Holding the defendants' contract unenforceable, the court issued a final judgment denying the defendants' motion to dismiss and to compel arbitration on March 12, 2019. ER1. The defendants timely appealed on April 10, 2019. ER56. This Court has jurisdiction under 9 U.S.C. § 16(a)(1)(B).

## STATEMENT OF THE ISSUE

Consistent with every federal court of appeal to have considered it, the district court refused to enforce the defendants' tribal arbitration contract because the contract expressly forbids an arbitrator from applying any relevant state or federal law. Should this Court depart from the unanimous view of the circuits and hold that an arbitration contract requiring consumers to prospectively waive all relevant state and federal rights must be enforced?

## STATEMENT OF THE CASE

*1. The tribal lending scheme.* Plain Green and Great Plains are nominal online lenders that offer low-dollar, high-interest loans over the internet to

consumers across the country. *See* ER244–47. Typically, a consumer borrows several hundred dollars but has to repay at triple-digit interest rates that can easily end up tripling or more the total dollar amount owed within just a few months. *See, e.g.*, *Hayes*, 811 F.3d at 668–69 (describing the basic tribal lending strategy). Both Plain Green and Great Plains hold themselves out as tribal entities. ER244, 248. Great Plains is associated with the Otoe-Missouria Tribe of Indians and Plain Green is associated with the Chippewa Cree Tribe. ER248–49.

But both online lenders are a front—the consumer-facing websites of a lending scheme that is the brainchild and profit center of the non-tribal participants, including the defendants in this case. ER244; *see generally Gingras*, 922 F.3d at 126–28; *see also* Heather L. Petrovich, *Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending*, 91 N.C. L. Rev. 326 (2012). These non-tribal entities actually funded and controlled the lending operation, and, together with other non-parties, marketed, initiated, and collected usurious loans in California. *See* ER253–65.

The defendants' main partner in the lending business was Think Finance. ER254. Think Finance operated on the fringe of consumer lending. To avoid complying with state usury and consumer-protection laws, it made extremely high-interest payday loans remotely through an entity called First Bank of Delaware. ER253. Although First Bank lent its name to the operation, it "served as nothing

more than a nominal lender" even though it "received 10% of the revenue from the loans." ER253.

But the scheme had a problem: Because high-interest loans often trap consumers in a cycle of debt, most states require lenders making small-dollar short-term loans to be licensed. The defendants did not, however, obtain a license in California, or anywhere else, to make this type of loan. That was unsurprising: the loans carried staggeringly high interest rates. Some of the defendants' loans assessed rates that vastly exceeded state usury laws, which typically cap interest rates at somewhere between 6% and 24%. *See* Guide to State Usury Laws, (2014) https://perma.cc/BB62-3TGR. As a result, in 2009, the Federal Deposit Insurance Corporation stepped in and shut down the Think Finance/First Bank lending operation. *See In re First Nat'l Bank*, Case No. FDIC-07-256b (Oct. 9, 2008) (ordering the operation to cease and desist and requiring restitution), https://perma.cc/D6JT-LQAN; ER253.

In response, the defendants turned to the burgeoning world of ostensibly tribal lending. In this now-familiar scheme, a non-tribal lender creates an "intentionally complicated and sham" lending structure that purports to offer loans through a tribal entity. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016) *see also Gingras*, 922 F.3d at 126 ("Courts across the country have confronted transparent attempts to deploy tribal sovereign immunity to skirt state

and federal consumer protection laws."). In reality, the tribal lender is "nothing more than a front" to enable the non-tribal participants "to evade licensure by state agencies and to . . . shield its deceptive business practices from prosecution by state and federal regulators." *In re CashCall, Inc.*, 2013 WL 3465250, at *3 (N.H. Banking Dept. June 4, 2013).

In 2011, Think Finance replaced its original lending model with a tribal lending one. The defendants here played a key role in establishing, operating, and then profiting from the lending scheme. *See* ER253–65. The enterprise first forged a relationship with the Chippewa Cree Tribe and created a new entity—Plain Green—to serve as a conduit for their illegal loans and to attempt to insulate them from the consequences of their otherwise illegal actions. ER254–55. It then did the same thing with the Otoe-Missouria Tribe, creating another entity called Great Plains. ER255–56. Under these arrangements, the defendants provided the infrastructure to market, fund, underwrite, and collect the loans while the tribes agreed to allow the loans to be originated in their names. ER258–65. The defendants also played "a critical role in finding a new bank to partner with both Plain Green and Great Plains" after they had been targeted by state and federal regulators (and the Department of Justice), resulting in some banks ceasing the processing of their loans. ER260. In return, the defendants received a monthly profit from their participation in the Tribal lending venture. ER245–46, 256.

The tribes, of course, played virtually no role in the lending operations. Within two days of a loan's origination in the Plain Green or Great Plains name, it was "purchased" by a shell company with zero employees which then refunded the money (plus interest) that the defendants had provided to the tribe. ER254. And it was the defendants in this case "who principally ran" the whole scheme by (1) providing tens of millions of dollars in funding, (2) finding banks willing to "partner" with the operations "after [they had been] targeted by state and federal regulators," and (3) bringing in third parties—including Think Finance and its CEO Kenneth Rees—to provide the necessary lending "infrastructure." *See* ER245, 260–65.[1]

**2. *Financial regulators crack down on the lending scheme.*** In the years since its inception, financial regulators have attempted to crack down on the defendants' illegal lending scheme. In 2013, New York issued a cease-and-desist order to the Plain Green and Great Plains lending operations "for offering illegal payday loans to New Yorkers." N.Y. State, *Cuomo Administration Demands 35 Companies Cease*

---

[1] Several third parties were sued separately for their role in the Plain Green and Great Plains lending schemes. Many of these defendants have entered into a settlement agreement that, upon final approval, will include loan forgiveness and cash refunds for those consumers who obtained a Great Plains or Plain Green loan. *See* Order Granting Final Approval, Dkt. #141, *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495 (E.D. Va. Dec. 13, 2019) (approving settlement); Order Granting Final Approval of Class Action Settlement, *In re Think Finance*, No. 17-33964 (Bank. N.D. Tex. Dec. 6, 2019) (approving settlement); *see also* Think Finance Settlement, https://perma.cc/CQ2Q-4RHG.

*and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), https://perma.cc/PD3U-X9BE. Although the state never authorized the companies to lend to New York consumers, regulators found that they were charging interest rates "in excess of 400, 600, 700, or even 1,000 percent" and attempting to "skirt New York[']s prohibition on payday lending by offering loans over the Internet." *Id*. Soon after, the Otoe-Missouria tribe was hit with additional cease-and-desist orders for similar efforts to circumvent state lending laws. *See*, *e.g.*, *In re Great Plains Lending, LLC*, Order to Cease and Desist (Ct. Dept. of Banking Jan. 6, 2015), https://perma.cc/NN2C-4LF2.

***3. California consumers sue the defendants.*** In an effort to curtail the defendants' unlawful conduct in California, a number of California consumers brought a putative class action against the defendants. *See* ER243–79. Over the course of several years, the plaintiffs in this case obtained payday loans from Plain Green and Great Plains over the internet from their homes in California. Although California caps a loan offered to consumers in the state at 10% APR, ER264, the Plain Green and Great Plains loans charged significantly higher rates—typically between 118% and 448% and sometimes even higher, ER264. They asserted violations of various California and federal laws related to the defendants' illegal lending. *See* ER265–79. They seek damages, reimbursement, and injunctive relief on

behalf of themselves and several classes of consumers who received similar loans. *See id*.

### 4. The defendants' attempt to shield their scheme from scrutiny.

Like other tribal lending schemes, the defendants' scheme is predicated on a contractual web of liability shields—an integrated (and sometimes inconsistent) set of choice-of-law provisions, forum-selection clauses, and arbitration requirements— deployed, as this Court recently put it, to "game the entire system." *Hayes*, 811 F.3d at 676. And although there is no "serious[] dispute" that these sorts of loans "violate[] a host of state and federal lending laws," *Hayes*, 811 F.3d 669, the defendants (like other tribal lending enterprises) premise their scheme on the theory that they can avoid liability by cloaking their activity in tribal immunity, *see, e.g.*, *Gingras*, 922 F.3d at 126– 28 (explaining the framework of this tribal payday lending entity as designed to enable the defendants "to skirt state and federal consumer protection laws" under the cloak of tribal sovereign immunity).

The Plain Green and Great Plains contracts expressly require borrowers to relinquish their rights under state and federal law.[2] The contracts contain several

---

[2] Although the contracts here vary in certain ways (for instance, the Plain Green contracts invoke the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation while the Great Plains contracts invoke the laws of the Otoe-Missouria Tribe of Indians), they are, as the district court explained, "materially similar" to each other in all relevant respects. ER15.

clauses purporting to establish complete tribal jurisdiction for, and require the application of tribal law over, any claims arising out of a Plain Green or Great Plains loan transaction. They state that the loan "shall be governed by the laws of the tribe," ER100 (Plain Green), and that any loan is "subject to and governed by tribal law and not the law of your resident state," *see* ER110 (Great Plains). They also state that, "for purposes of this Agreement," a consumer "irrevocably consent[s] to the exclusive jurisdiction of the Tribal courts." ER107 (Plain Green); ER118 (Great Plains).

These exclusive tribal-law and tribal-forum requirements are coupled with a demand that any dispute over the legality of the loans be resolved in arbitration, not court. The Plain Green contract states that "This Agreement and the Agreement to Arbitrate are governed by Tribal law" and that "[n]either this Agreement nor the Plain Green [sic] is subject to the laws of any state of the United States." ER105 (stating that the contract "also comprehends the application of the Federal Arbitration Act" but only "as provided below"). And the Great Plains contract contains similar language. *See* ER116 (providing that "This Agreement and the Agreement to Arbitrate are governed by Tribal law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America").

The terms of the relevant arbitration clauses then provide that, although a party may "choose" either the American Arbitration Association (AAA) or JAMS,[3] any arbitrator (regardless of provider) is forbidden from applying any rules or law that would "contradict this Agreement to Arbitrate or Tribal Law." ER106 (stating that, "[t]o the extent the arbitration firm's rules or procedures are different than the terms of this Agreement to Arbitrate, the terms of this Agreement to Arbitrate will apply"); *see also* ER118 (explaining that any "arbitration under this Agreement" shall not "allow for the application of any law other than Tribal law"); *see also id.* (instructing that the "arbitrator shall apply Tribal law and the terms of this Agreement" and "has the ability to award all remedies available under Tribal law"); *see also* ER106–07 (same, for Plain Green).

The defendants' contracts also purport to completely insulate them from any review by a federal court whatsoever. They do that in three steps. *First*, the contracts contain a front-end "delegation clause," requiring arbitration of "any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate." ER106 (Plain Green); ER117 (same, for Great Plains). *Second*, the contracts eliminate any ability of a federal court to review what happens in arbitration. They mandate that any challenge to the arbitration must "be filed with

---

[3] The Great Plains contract offered the choice of either JAMS or the International Institute for Conflict Prevention and Resolution (CPR). *See* ER117.

a Tribal court," thus barring a party's right to appeal in federal court. ER107 (Plain Green) (stating that the arbitration "may be set aside by a Tribal court upon judicial review"); ER118 (same, for Great Plains). And they restrict "judicial review in a Tribal court" to only "(a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence," "(b) whether the conclusions of law are erroneous under Tribal law," or (c) whether the decision was "consistent with this Agreement and Tribal law." ER107 (Plain Green); *see* ER118 (same, for Great Plains). *Third*, the contracts purport to cover a wide range of related third parties and affiliated entities—meaning that even non-tribal defendants can avail themselves of the exclusive tribal-law and arbitration process devised under the contracts. *See* ER106 (stating that the contract will cover and apply to, among others, "Plain Green's affiliated companies, the Tribe, Plain Green's servicing and collection representatives and agents, and each of their respective agents, representatives, employees, officers, directors, members, managers, attorneys, successors, predecessors, and assigns"); ER117 (similar, for Great Plains).

Based on these provisions, the defendants moved to force this case into arbitration.

**_5. The district court denies the defendants' motion to compel the claims into tribal arbitration._** The district court refused to allow the defendants to enforce the contracts' tribal forum-selection, choice-of-law, and arbitration

clauses. ER1–38. Following the unanimous view of the federal circuits, it held that, because the defendants' contracts strip consumers of their federal and state statutory rights, they were unenforceable. ER10–16. Finding that the contracts were "materially similar" to those invalidated by other federal courts, the court had little difficulty concluding that they operated as "unenforceable prospective waivers." ER16. *see also* ER17 (applying the analysis set forth in *Hayes* and *Dillon* to conclude that the "the choice-of-law provisions regarding the lenders and the loan agreements, in conjunction with arbitration agreement provisions restricting the law the arbitrator may apply, create an unambiguous waiver of rights and the agreements and are therefore unenforceable").[4]

## SUMMARY OF ARGUMENT

**I.** The defendants wrongly claim that their contracts do not constitute an impermissible prospective waiver. The federal circuits have, when confronted with these types of tribal-arbitration contracts, unanimously held that they are unenforceable under the FAA because they are designed to avoid federal and state consumer protection laws. *See Gingras*, 922 F.3d at 127 (holding that a Plain Green

---

[4] Because the district court held that the defendants' contracts operate as an impermissible prospective waiver, it did not reach any of the alternative arguments raised by the consumers against enforcement, including unconscionability. *See* ER18. The district court also denied the defendants' motion to stay the case pending the outcome in *Gingras*, ER18–22, and denied their various motions to dismiss, ER22–36. None of these orders are the subject of this appeal.

contract is unenforceable); *Dillon*, 856 F.3d at 336 (invalidating a materially identical Great Plains contract); *Hayes*, 811 F.3d at 675–76 (same, for a different tribal arbitration contract). None of the defendants' efforts to evade this weight of authority can prevail. Although the FAA hands parties considerable freedom to structure arbitration agreements, it has long been the rule that this freedom does not extend to a prospective waiver of a party's statutory rights.

No less than any of the others, the contracts here unambiguously forbid a consumer from pursuing any federal or state statutory claims and bar an arbitrator from applying any of the relevant federal or state law to a consumer's claims or awarding any of the relevant remedies. They state that the contracts "are governed by Tribal Law," ER105, 116, and that "neither this Agreement nor the Lender is subject to any laws of any state of the United States." *See* ER116 (Great Plains); ER105 (similar, for Plain Green). These exclusive tribal-law requirements are then coupled with a requirement that any "arbitration under this Agreement" may not "allow for the application of any law other than Tribal law"; that the "arbitrator shall apply Tribal law and the terms of this Agreement"; and that the arbitrator has the authority to "award all remedies available under Tribal law." ER107, 118. That operates as an unenforceable prospective waiver of a consumer's right to pursue statutory claims.

The defendants claim that, under the FAA's prospective-waiver rule, even if the contracts extinguish a consumer's statutory cause of action, they cannot be

invalidated. *See* Haynes Br. 46 (arguing that the prospective waiver doctrine applies "only when a litigant demonstrates that the arbitration and choice-of-law clauses *eliminate the right to pursue a remedy*") (emphasis defendants'). But that is not what the Supreme Court has said. In *American Express*, it made clear that the prospective-waiver rule "certainly cover[s]" an arbitration contract that attempts to "forbid[] *the assertion of certain statutory rights*." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (emphasis ours). What matters, in other words, is not whether the contract affords a consumer the right to pursue *some remedy*; it is, instead, whether it forbids the consumer from pursuing the specific statutory remedies afforded by federal and state law. Contracts like those at issue here that waive a claimant's statutory rights are simply invalid under the FAA.

The defendants' attempt to completely insulate this scheme from any federal- or state-court review whatsoever further reinforces their intent. On the front end, the contracts purport to allow only an arbitrator to determine whether the contract is invalid. *See, e.g.*, ER106. And on the back end, consumers are stripped of any ability to appeal to federal or state court. Instead, any challenge must, under the contracts, be filed in Tribal court and may be "set aside" if "the conclusions of law are erroneous under Tribal law" or if the arbitration was not "consistent" with tribal law. ER107, 118. Standing alone, neither clause is enforceable; taken together, they lay bare the purpose of these contracts: to effectively insulate the defendants from

any adverse award and leave prospective litigants without a fair chance of prevailing in arbitration. The process, in other words, is a "sham from stem to stern." *Jackson*, 764 F.3d at 779.

The district court was also right to reject the defendants' delegation-clause arguments. Not only was a specific challenge to the delegation clause expressly raised in the district court, but every federal court that has considered this exact argument has refused to enforce identical delegation clauses separate and apart from the rest of the arbitration clause, and for the same reasons. *See, e.g.*, *Gingras*, 922 F.3d at 126 (invalidating delegation clause on the same basis as the entire arbitration contract); *MacDonald*, 883 F.3d at 226–27 (explaining that, "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions"); *Hayes*, 811 F.3d at 671 n.1; *Dillon*, 856 F.3d at 332 (quoting the Great Plains contract's statement that "any dispute" must be sent to arbitration).

**II.** Splitting with the unanimous view of the circuits and embracing the defendants' cynical effort to game the system here would invite a race to the bottom. Artful drafting would make it trivially easy to slip the FAA's prohibition on contracts that seek to avoid otherwise applicable federal and state laws, even as these contracts could be deployed to have the same effect. And that would enable non-tribal entities to engage in ongoing lending and collection practices free from the strictures of any

federal law safe in the knowledge that, if ever challenged, they could just walk back the clear import of their contract and concede that a single consumer could potentially pursue their claims in arbitration. But an arbitration contract "does not, in the context of litigation, become [an] opening bid in a negotiation . . . over the agreement's unconscionable terms." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 205 (3d Cir. 2010). Instead, where a company drafts the contract, it is "saddled with the consequences . . . as drafted." *Id.* This Court should affirm.

## STANDARD OF REVIEW

This Court's review of a district court's order denying a motion to compel arbitration is plenary. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

## ARGUMENT

### I. The contracts are unenforceable because, by their terms, they forbid the application of state and federal law.

The defendants' effort to compel arbitration fails for one simple reason: By their terms, the contracts ensure that, no matter who the arbitrator is or where the arbitration occurs, the federal and state laws governing a consumer's claims may not be applied. That is forbidden under the FAA. Although the FAA has a broad reach, courts will not enforce a contract that operates as a "prospective waiver of a party's right to pursue statutory remedies." *Am. Express*, 570 U.S. at 235. Over the past three years, this rule has been consistently applied by this Court to invalidate similar efforts by payday lenders to enforce nearly identical tribal-arbitration contracts that

disavow state and federal law. The Court has thus delivered an unmistakable message: When an arbitration contract is drafted "in a calculated attempt to avoid the application of state and federal law," the "entire arbitration agreement is unenforceable." *Dillon*, 856 F.3d at 337. None of the defendants' arguments can overcome this settled rule.

### A. The contracts are invalid under the FAA because they prospectively waive a consumer's statutory rights.

**1.** The rule that a contract is unenforceable when it prospectively waives a party's right to pursue statutory remedies is grounded in both the FAA's text and its policy. Under the FAA, arbitration contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. By stressing the contractual nature of FAA arbitration, this statutory command "establishes an equal-treatment principle." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017). A court may invalidate an arbitration contract based on "generally applicable contract defenses" but not on legal rules that "'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). In this way, the FAA expressly preserves any contract-law doctrine that would "place arbitration agreements on an equal footing with other contracts." *Concepcion*, 563 U.S. at 339.

One of these rules is that a contract is invalid if it forbids the assertion of statutory rights. Courts will invalidate any contract—arbitration or otherwise—that attempts to foreclose "the assertion of certain statutory rights," because such a contract would jeopardize a party's "right to pursue statutory remedies." *Am. Express*, 570 U.S. at 236. And the Supreme Court has in fact recognized this rule for as long as it has applied the FAA to statutory claims. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) (holding that "a substantive waiver of federally protected civil rights will not be upheld"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (noting that arbitration must permit a party to pursue statutory claims so that "the statute will continue to serve both its remedial and deterrent function"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("condemning" a contract that would foreclose the right to pursue statutory claims as "against public policy"). Under the FAA, then, an arbitration contract (no less than any other) is invalid where it attempts to "eliminat[e] . . . the right to pursue" a statutory remedy. *Am. Express*, 570 U.S. at 236.

The FAA's core policy reinforces the centrality of this rule. The FAA was enacted to overcome "widespread judicial hostility to arbitration," and its "overarching principle" that "arbitration is a matter of contract" means that courts must "rigorously enforce" arbitration agreements according to their terms. *Id.* at 232–33. But although "a court's authority under the Arbitration Act to compel arbitration

may be considerable, it isn't unconditional." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). To the contrary, "no matter how emphatically [a contract] may express a preference for arbitration," *id.*, the FAA "may not play host" to an arbitration scheme that "[w]ith one hand . . . offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other . . . proceeds to take those very claims away." *Hayes*, 811 F.3d at 673–74. That is because although the FAA permits parties to "forgo the legal process and submit their disputes to private dispute resolution" to enhance the "simplicity, informality, and expedition" of the matter, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682–83 (2010), it does not allow the terms of a contract to employ arbitration to sacrifice substantive claims. *See* 9 U.S.C. § 2 (providing for enforcement of contract "to settle by arbitration a controversy"). "By agreeing to arbitrate a statutory claim," in other words, "a party does not forgo the substantive rights afforded by the statute" but "submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628.

This rule must be rigorously enforced. If arbitration is to have any "meaningful sense," courts must refuse to endorse schemes that "would undermine, not advance, the federal policy favoring alternative dispute resolution." *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 941 (4th Cir. 1999) (Wilkinson, C.J.). Consistent with this understanding, "so long as the prospective litigant effectively may vindicate its

statutory cause of action in the arbitral forum," courts may enforce the parties' contract under the FAA; but where, in contrast, a contract denies a litigant this very opportunity, courts should not. *Mitsubishi*, 473 U.S. at 637.

**2.** The defendants press a preliminary objection to this settled framework. They suggest that, under the FAA's prospective-waiver rule, it is not enough that the contract eliminates claims and defenses entirely. Haynes Br. 41–43. In their view (at 41), even if the contract extinguishes a consumer's statutory cause of action, it cannot be invalidated unless it "preemptively" eliminates the right to pursue *any* remedy. *See also* Haynes Br. 44–45 (arguing that, under the prospective waiver rule, a plaintiff is required to prove that the contract "'would bar recovery' entirely").

That is wrong. The Supreme Court has made clear that the prospective waiver rule "certainly cover[s]" an arbitration contract that operates to "forbid[] the assertion of certain statutory rights." *Am. Exp.*, 570 U.S. at 236 (emphasis ours); *see also Mitsubishi*, 473 U.S. at 637. So, although "the FAA gives parties the freedom to structure arbitration in the way they choose," that freedom does not extend to an "outright prohibition" on a consumer's ability to bring statutory claims and seek statutory remedies—regardless of what relief a consumer might ultimately obtain. *Hayes*, 811 F.3d at 674–75. As the Supreme Court has put it, the primary aim of the rule is to "prevent [a] 'prospective waiver of a party's right to pursue statutory remedies.'" *Am. Exp.*, 570 U.S. at 235 (emphasis in original); *see also Gingras*, 922 F.3d

at 127 (explaining that, where a tribal-arbitration contract "provides no guarantee that federal and state statutory rights could be pursued," it is unenforceable). This Court, no less than any others, shares this understanding. *See Graham Oil Co. v. ARCO Prod. Co.*, 43 F.3d 1244, 1247 (9th Cir. 1994) (holding that the FAA prohibits contracts that force a party "to surrender the statutorily-mandated rights and benefits that Congress intended them to possess").

Even so, the defendants invite this Court to depart from this settled view based on this Court's decision in *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998). Looking to that case, they argue that this Court has in fact adopted an "onerous standard for prospective waiver" that does not permit a court to invalidate arbitration contracts that "would immunize defendants" from otherwise applicable federal laws, but rather only those contracts that would as an evidentiary matter deprive a party of any "ability to recover" at all. Haynes Br. 44–46 (stating that the plaintiffs here "failed to show anything more than a mere risk that they will be barred from pursuing legally adequate remedies").

The defendants' focus on *Richards* is misplaced. That case involved an international transaction and contract and so implicated the different analytical framework that applies to the enforceability of "private international agreements." *Richards*, 135 F.3d at 1291, 1294 (explaining that the plaintiffs "flew to England to consummate the transaction"). Unlike contracts subject to Chapter 1 of the FAA,

international contracts fall under Chapter 2 of the FAA—which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards—and are subject to the Convention's specific framework for evaluating enforceability. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355 (4th Cir. 2012) (explaining how international-comity concerns inform the enforceability analysis of arbitration contracts governed by the Convention); *see also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1293–94 (11th Cir. 1998) (noting that "international agreements . . . are *sui generis*" and that the FAA's prospective-waiver rule does not apply to "truly international agreements"). But the defendants here do not (and could not) contend that their contract is governed by Chapter 2 or the Convention, *see, e.g.*, Haynes Br. 5 (premising this Court's jurisdiction on 9 U.S.C. § 16), and so this alternative framework does not control. Not surprisingly, then, none of the circuits confronting tribal-arbitration contracts saw these decisions (several of which arose within their own circuits) as compelling a different result. It is therefore *Graham Oil*, not *Richards*, that supplies this Court's governing rule of decision here.[5]

**3.** Turning to the actual application of the prospective-waiver rule, the defendants' contracts here straightforwardly violate the FAA's clear prohibition on

---

[5] As discussed below (at 44–46), the defendants' argument fails even on its own terms because the contracts explicitly foreclose *any* back-end federal court review. So even were it true that the prospective-waiver rule requires evidentiary proof that the contracts deprive consumers of any remedy whatsoever, it wouldn't help the defendants here because no post-arbitration federal court review is available.

contractual waivers. They provide that any dispute over the loan shall be "subject to and governed by tribal law," and that the contracts themselves "shall be governed by tribal law." ER107 (Plain Green); ER118 (Great Plains). And they require that any arbitrator—regardless of who it is—"shall apply" this mandate as written. ER118 (instructing that the "arbitrator shall apply Tribal law and the terms of this Agreement"). They also forbid the arbitrator from applying any rules or law that would "contradict this Agreement to Arbitrate or Tribal Law," permit an arbitrator to only award those "remedies available under Tribal law," and specifically instruct that any "arbitration under this Agreement" may not "allow for the application of any law other than Tribal law." ER106–07, 118. Because that language renounces "the application of federal or state law" to a consumer's claims and directs that "the arbitrator shall not allow for the application of any law other than tribal law," the "entire arbitration agreement is unenforceable." *Dillon*, 856 F.3d at 335–37; *see also Hayes*, 811 F.3d at 669–71, 675 (holding that a tribal-arbitration contract is unenforceable under the FAA where it "names a tribal forum and then purports to disavow the authority of all state or federal law").

Other clauses in the contracts reinforce the point. For instance, another provision provides that "[n]either this Agreement nor the Plain Green [sic] is subject to the laws of any state of the United States." ER105; ER116 (similar, for Great Plains). The same was true in *Dillon*: the contract there contained a similar disclaimer

providing that "[n]either this Agreement nor the Lender is subject to the laws of any state of the United States." 856 F.3d at 333. There is nothing subtle about this: Under the contract, no consumer can bring a federal or state statutory consumer-protection claim in arbitration and no arbitrator can apply the relevant law. On this, at least, the defendants appear to concede the point. *See, e.g.*, Haynes Br. 39 (noting that "the arbitration agreements select Native American law").

The "brazen nature" of the defendants' attempt to free themselves from the strictures of state and federal law is, if anything, more evident here. Their contracts not only disavow a consumer's right to seek relief under federal or state law, but they also attempt to block any federal or state court from ever reviewing that effort. They state that (1) any front-end challenge to the arbitration contract's "validity, enforceability, or scope" must be sent to an arbitrator (who is required to decide such a challenge based only on tribal law) and (2) any back-end challenge must be "filed with a Tribal court"—not a federal or state court—and that any arbitration may be "set aside by a Tribal court upon judicial review" only if "the conclusions of law are erroneous under Tribal law" or if the decision is not "consistent with this Agreement and Tribal law." ER106–07, 118. By its terms, then, the contracts seek not only to eliminate a consumer's right to pursue relief under state and federal law, but also to completely insulate that effort from meaningful judicial review. Not even the contracts in *Hayes* or *Dillon* went this far.

Every court of appeals that has confronted a tribal-arbitration contract has seen this scheme for what it is: a transparent attempt "designed to avoid federal and state consumer protection laws" through a series of calculated provisions found directly in the contract. *Gingras*, 922 F.3d at 125, 127 (noting that the FAA will not sanction enforcement of contracts that "effectively insulate Defendants from claims that they have violated federal and state law"). In *Hayes*, for instance, the tribal loan contract included a choice-of-law provision stating that the contract "shall be governed by the law of the Cheyenne River Sioux Tribe." 811 F.3d at 666–70. That language was then paired with an arbitration clause that required the arbitrator to "apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement" to any claims. *Id.* at 670; *see also id.* at 673. And in *Dillon*, the same tribal-arbitration contract that is now before the Court in this case stated that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians" and required any arbitrator to "apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement." 856 F.3d at 335. Both contracts were invalidated in their entirety.

In fact, although five circuits have considered them (some, multiple times), *not once* have they ever enforced a payday lender's tribal-arbitration contract. *Gingras*, 922 F.3d at 127 (2d Cir); *MacDonald*, 883 F.3d at 227 (3d Cir.); *Dillon*, 856 F.3d at 335 (4th Cir); *Hayes*, 811 F.3d at 676 (4th Cir.); *Jackson*, 764 F.3d at 779–80 (7th Cir.); *Parnell*, 664 F. App'x at 841 (11th Cir.); *Parm*, 835 F.3d at 1334 (11th Cir.); *Inetianbor*, 768 F.3d at 1354

(11th Cir.). That makes sense. The FAA does not permit a company to free itself from the application of federal and state law. As this Court has explained, an arbitration contract may not, "[w]ith one hand," offer "an alternative dispute resolution procedure in which aggrieved persons may bring their claims," and "with the other, [] proceed[] to take those very claims away." *Hayes*, 811 F.3d at 673–74. Because tribal-arbitration contracts "purport[] to offer neutral dispute resolution" but actually "disallow claims brought under federal and state law," the federal courts—both circuits and district courts alike—have roundly condemned these contracts as unenforceable. *Gingras*, 922 F.3d at 127.

### B. The existence of other (inadequate) remedies under tribal law does not save the contracts.

The defendants offer one main reason why this Court should cast aside this weight of authority. They say that the "mere fact" that their contracts select tribal law "to the exclusion of state and federal law . . . does nothing to prove Plaintiffs would be unable to effectively vindicate their claims in arbitration." Haynes Br. 39. As they see it, to succeed on a prospective-waiver challenge, a litigant shoulders the burden "of *proving* that they would be unable to pursue adequate remedies in arbitration under tribal law." Haynes Br. 39. The circuits have squarely rejected this precise argument. A contract that "attempt[s] to apply tribal law to the exclusion of federal and state law" accomplishes a prospective waiver so long as it states that the parties' rights "shall be governed" by tribal law and requires that any arbitrator must

comply with this command. *Dillon*, 856 F.3d at 335, 336 (invalidating the contract because it barred an arbitrator from applying relevant federal or state law).

And that would remain true even in the face of a defendant's "concession to the application of federal substantive law in arbitration" notwithstanding its choice of tribal law in the contract. *Id.* at 336. Although the defendants argued below that the contracts "do not reject or preclude the application of federal law," ER86, they have not pressed that claim here. And for good reason: it would have "no merit" because it would allow a defendant to simply "rewrite the unenforceable foreign choice of law provision in order to save the remainder" of the contract. *Dillon*, 856 F.3d at 336. An arbitration contract "does not, in the context of litigation, become [an] opening bid in a negotiation . . . over the agreement's unconscionable terms." *Nino*, 609 F.3d at 205. Instead, where a company drafts the contract, it is "saddled with the consequences . . . as drafted." *Id.* So long as the contract uses a choice-of-law provision and arbitration clause to "effectively insulate Defendants from claims that they have violated federal and state law," it is invalid. *Gingras*, 922 F.3d at 125.

And make no mistake: the contract's reference to the "voluntary use" of, or compliance with, "certain federal laws as guidelines" does nothing to blunt the contracts' disavowal of those laws at the heart of this case. *See* ER105, 116 (noting that the lender "may choose to voluntarily use certain federal laws as guidelines"). The contracts here are very clear that the defendants' compliance with federal law "does

not represent acquiescence" to "any federal law unless found expressly applicable to the operations of the...Tribe." ER105, 116. And, no surprise, among those laws that are not expressly applicable—because Congress has not unambiguously abrogated a tribe's immunity from them—are "all state law claims" as well as any "federal RICO claim." *Gingras*, 922 F.3d at 120 (noting that the tribal lenders assert that "they are entitled to immunity" from these claims).

That gives away the game. What matters isn't whether the contract (or tribal law) carves out a narrow exception for the defendants' voluntary compliance with *some particular* law (like the Truth In Lending Act); it is, instead, whether it precludes a plaintiff from pursuing the *specific* statutory rights at issue in the case, namely claims under RICO and state consumer-protections laws. *See Gingras*, 922 F.3d at 127 (holding that the incorporation of "some federal law or Montana law does not save the agreements"). And where an arbitration contract "compels [a party] to surrender important statutorily-mandated rights afforded" under a federal law, it "contravenes the [FAA]" regardless of whether *other* statutory rights remain available. *Graham Oil Co.*, 43 F.3d at 1248 (invalidating an arbitration contract even though it authorized a party to bring a federal statutory claim because it foreclosed the right to seek certain remedies afforded under the statute). Were it otherwise, a drafter could easily slip the prohibition by voluntarily complying with a single even irrelevant law.

Nor does the substance of the tribe's law affect the analysis. The defendants suggest (at 19–20, and throughout) that there is no prospective-waiver problem here because there is "no evidence" that consumers will be unable to effectively vindicate their claims in arbitration. To support that claim, they cite (at 11–14, 37) to the Otoe-Missouria code and say that consumers would be able to pursue "real and significant remedies" under the selected Native American codes. But, as both *Dillon* and *Gingras* make clear, a contract that "attempt[s] to apply tribal law to the exclusion of federal and state law" is unenforceable "as a matter of law," regardless of any alternative remedies that might be available under tribal law. *Dillon*, 856 F.3d at 336, 334; *see also Gingras*, 922 F.3d at 127.

And even if the relevant inquiry was whether the substance of the claims could be vindicated, the relevant tribal codes are woefully inadequate. Although the Otoe-Missouria Tribal Consumer Financial Services Ordinance references some federal laws and instructs that lenders "shall conduct business in a manner that complies" with them, among those laws absent from this list are those that govern the claims at issue in this case. Otoe-Missouria Tribal Consumer Fin. Servs. Ord. § 5.2(a) (2018), https://perma.cc/T68B-DJZ4. And, even for those laws that are listed, the code makes clear that a lender's compliance is voluntary and does not constitute "consent . . . related to the applicability of federal laws" or a waiver of the lender's "sovereign immunity from unconsented judicial or administrative process." *Id.* at §§ 5.2(b), 7.5(a).

And what about others who are not "licensed lenders" under the code? The code governs "licensed lenders" but says nothing about other non-tribal entities or individuals who (like in this case) might also have acted illegally. *See, e.g.*, *id.* at § 4.1 (exempting a whole range of entities and persons "from the licensing requirements").

It is, for that matter, not even clear how a consumer would meaningfully pursue *any* claim under this code. Although it contains something called a "consumer complaint procedure," it does not appear to provide for or establish any private right of action for violations of any code provisions, let alone those federal laws with which lenders will allegedly voluntarily comply. *Id.* at §§ 8.1–8.4. Instead, it offers only that consumers can file a "complaint" with either the lender itself or a "Tribal Consumer Finance Services Regulatory Commission" and await a "decision with respect to a complaint," which is "final." *Id.* at §§ 8.2–8.3; *but see id.* at § 10.6 (authorizing the tribal commission, but not an individual, to bring a "civil complaint"). There also appears to be no guaranteed remedial mechanism allowing consumers to recover for any violations either. Instead, the code authorizes the commission to "grant or deny any relief as the Commission deems appropriate." *Id.* at § 9.2(c). Given this setup, the defendants' insistence that consumers would have any opportunity to "effectively vindicate the federal statutory claims" is absurd. Haynes Br. 29.[6]

---

[6] Without belaboring the point, the Chippewa code is likewise inadequate. It contains a single "civil remedies" provision that limits a defendant's liability to

Bottom line: Because tribal law provides no guarantee that federal and state statutory rights could be pursued, much less vindicated in an arbitral forum while at the same time forbidding an arbitrator from considering *any* of the federal claims asserted by a consumer, the contracts are invalid.

### C. The choice-of-law clause cannot be read in isolation and does not save the contracts.

The defendants next attempt to analogize the contracts to those that "contain choice-of-law provisions which select the laws of a foreign jurisdiction and expressly exclude federal law." Haynes Br. 40 (insisting that the contracts' choice-of-law provisions are no different from choosing to "have portions of the[] contract governed by the law of Tibet"). But that reflects a basic category error. As the Fourth Circuit explained in *Hayes* when rejecting a similar analogy, "[i]nstead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause," a tribal-arbitration contract "uses its 'choice of law' provision to waive all of a potential claimant's federal rights." 811 F.3d at 675 (noting that a tribal choice-of-law clause "underhandedly convert[s] a choice of law clause into a

---

"actual damages" and only for "intentional[]" violations of the code itself. Chippewa Cree Tribal Lending and Regulatory Code § 10-6-201 (2017), https://perma.cc/Q4JV-7DR3 (specifying that these remedies are "exclusive"). That comes nowhere close to affording a consumer the remedies available under federal or state law. *See, e.g., Graham Oil*, 43 F.3d at 1248 (invalidating an arbitration contract even though it authorized a party to bring a federal statutory claim because it foreclosed the right to seek certain remedies afforded under the statute).

choice of no law clause"); *see also Mitsubishi Motors*, 473 U.S. at 637 n.19 (explaining that, to be effective, a foreign choice-of-law clause cannot "wholly [] displace American law even where it otherwise would apply"). To violate the FAA, in short, a tribal-arbitration contract does not need to specifically disclaim the application of each and every federal law.

The problem with the defendants' contrary argument is that it only works if the contractual choice-of-law requirements can be divorced from the arbitration clause. Here, they cannot. As the Supreme Court explained when it first announced the prospective-waiver rule, to assess whether a contract triggers a prospective waiver, a court first must determine whether the "choice-of-forum *and* choice-of-law clauses operate[] in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Mitsubishi*, 473 U.S. at 637 n.19 (emphasis added). In this case, the two are inseparable—the contracts' arbitration clause itself incorporates the tribal choice-of-law provisions. It states that (1) "this Agreement to Arbitrate shall be governed by Tribal law;" (2) that the arbitrator "shall apply Tribal Law and the terms of this Agreement;" and (3) that any arbitration shall not "allow for the application of any law other than Tribal law." ER106–07, 118.

This rule readily follows from the fundamental principle that arbitration contracts must be "enforced according to their terms." *Stolt-Nielsen*, 559 U.S. at 682. If the express terms of the arbitration clause require an arbitrator to comply with the

contract as written, and the contract requires the exclusive application of tribal law, the arbitrator has no authority to apply other law—unlike a court, "an arbitrator derives his or her powers" *only* from the parties' contract. *Id.* And unlike a court, an arbitrator "has no general charter to administer justice" but is instead restricted to what is "created by and confined to the parties." *Id.* at 683 (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581 (1960)).

The reference to AAA or JAMS does not alter this understanding. *See* Haynes Br. 9 (arguing that the contract's use of either AAA or JAMS affords consumers the ability to arbitrate "before one of two national-recognized and well-respected arbitration service provider[s]"). The terms of the relevant arbitration clauses forbid any arbitrator—even the "well respected"—from applying any rules or law that would "contradict this Agreement to Arbitrate or Tribal Law." ER106, 116 (stating that, "[t]o the extent the arbitration firm's rules or procedures are different than the terms of this Agreement to Arbitrate, the terms of this Agreement to Arbitrate will apply"); *see also* ER106, 118 (explaining that any "arbitration under this Agreement" may not "allow for the application of any law other than Tribal law"); *see also id.* (instructing that the "arbitrator shall apply Tribal law and the terms of this Agreement"). And, worse still, were a consumer to attempt to appeal the arbitrator's decision, that appeal could not be heard by a federal court and could only be "set aside" if it was "erroneous under Tribal law." ER107, 118 (providing that any

arbitration award "must be consistent with this Agreement and Tribal law, and, if it is not, it may be set aside by a Tribal court"). By contrast, if an arbitrator *did* apply any law beyond Tribal law, that would, under these contracts, constitute grounds for reversal.

This integrated set of provisions in the contracts thus binds an arbitrator's hands, even as they wouldn't bind a court. Any court facing the defendants' effort to forbid consumers from pursuing their federal and state law consumer-protection claims would therefore have little difficulty rejecting it—not least because the defendants seeking to enforce it here "do[] not attempt to ground [their] renunciation of federal law in any claim of tribal affiliation." *Hayes*, 811 F.3d at 673; *see also Jackson*, 764 F.3d at 783 (dismissing any suggestion that a contractual tribal-forum-selection clause can confer tribal-subject-matter jurisdiction over a nonmember's consumer-protection claims); *MacDonald v. CashCall, Inc.*, 2017 WL 1536427, at *10–14 (D.N.J. Apr. 28, 2017) (rejecting any effort to apply tribal law to a consumer's state consumer-protection and usury claims). And that is precisely what the district court did here. *See* ER29–30 (invalidating the contracts' tribal choice-of-law because they purport to displace California law). Yet by forcing any claims out of court, the contracts attempt to sidestep this possibility entirely.

And although this basic understanding applies to those contracts (like those here) that are governed under Chapter 1 of the FAA, it does not for those

international contracts governed by Chapter 2. That makes the defendants' focus on cases addressing the latter misplaced. *See* Haynes Br. 22–23, 41–42 (discussing, among others, *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995) and *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355 (4th Cir. 2012), and arguing that a foreign choice-of-law clause is enforceable even where it "select[s] the laws of foreign sovereigns to the exclusion of domestic state and federal law").

Unlike contracts subject to Chapter 1 of the FAA, international contracts fall under Chapter 2 of the FAA. That Chapter implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and subjects contracts to the Convention's specific framework for evaluating enforceability. *See Aggarao*, 675 F.3d 355 (explaining how international-comity concerns inform the enforceability analysis of arbitration contracts governed by the Convention); *see also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1293–94 (11th Cir. 1998) (noting that "international agreements . . . are *sui generis*" and that the FAA's prospective-waiver rule does not apply to "truly international agreements"). Here, the defendants do not (and could not) contend that the contracts are governed by Chapter 2 or the Convention and so this alternative framework does not control.

Not surprisingly, then, the circuits have (once again) unanimously held that that these international arbitration decisions do not compel a different result when it comes to these tribal contracts. In both *Hayes* and *Dillon*, the Fourth Circuit explicitly

cited, and discussed, those cases involving contracts selecting foreign law and correctly rejected their application in this context. *See Dillon*, 856 F.3d at 334 (specifically citing (multiple times) *Aggarao* and *Vimar Seguros* and explaining that these decisions do not control the analysis of tribal-arbitration contracts); *Hayes*, 811 F.3d at 674 (same, for *Vimar Seguros* and noting that tribal-arbitration contracts are distinguishable from those providing for arbitration "in foreign countries").

The defendants' failure to even acknowledge this basic point speaks volumes. The defendants here do "not attempt to ground" their "renunciation of federal law in any claim of tribal affiliation" that renders them "not subject to the authority of federal law." *Hayes*, 811 F.3d at 673. Instead, the contracts "offer[] an alternative dispute resolution procedure in which aggrieved persons may bring their claims" but then "proceeds to take those very claims away." *Id.* at 673–76 (explaining that this contract "almost surreptitiously waives a potential claimant's federal rights through the guise of a choice of law clause"). That is an integrated scheme to contravene public policy and it is unenforceable.

### D. The presence of a delegation clause does not make the contracts enforceable.

The presence of a delegation clause—a provision designed to allow an arbitrator to decide certain threshold questions concerning the contract's enforceability—does not change the foregoing. The defendants argue that the district court should have let the arbitrator resolve all "threshold issues of

arbitrability" surrounding the contracts because they contain a delegation clause. Haynes Br. 24–33. But a contract that contains an FAA-prohibited prospective waiver is unenforceable in its entirety, delegation clause included. "In practical terms, enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law." *Smith v. Western Sky Fin., LLC*, 168 F. Supp. 3d 778, 781 (E.D. Pa. 2016) (emphasis in original). As a result, any delegation clauses in the contracts are unenforceable "for virtually the same reason" that the rest of the contracts are unenforceable. *MacDonald*, 2017 WL 1536427, at *4; *Parm*, 835 F.3d at 1338 (invalidating *both* the delegation clause *and* the underlying arbitration contract); *Parnell*, 664 F. App'x at 843–44 (same); *Hayes*, 811 F.3d at 671 n.1 (same).

The Second Circuit's recent decision in *Gingras* confirms the settled rule. There, the defendants (several of whom are the defendants here) argued that the existence of a delegation clause in the contract "unambiguously require[d] the parties' disagreement[] to be arbitrated." *Gingras*, 922 F.3d at 126. The Second Circuit firmly rejected this claim. "'[I]f a party challenges the validity under [9 U.S.C.] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4.'" *Id.* (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). And that is true even where a delegation clause "appears to give the arbitrator blanket authority over the parties'

disputes." *Id.* Thus, where a plaintiff lodges a "specific attack on the delegation provision," that is "sufficient to make the issue of arbitrability one for a federal court." *Id.* (noting that the plaintiffs specifically challenged the validity of delegation clause). This rule applies with full force here.

In response, the defendants invite this Court to adopt a radical new rule of arbitrability: that the mere "presence" of a delegation clause *categorically* deprives federal courts of the authority to decide any prospective-waiver argument. *See* Haynes Br. 25–29. Relying on the Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, the defendants suggest that, if the contract delegates the arbitrability issue to an arbitrator, a court "may not decide the arbitrability issue." Haynes Br. 26 (arguing that the presence of a delegation clause "deprives the district court of all 'power'" to decide whether the contract is valid). But as with the defendants' other arguments, courts confronting this one have squarely dismissed it. "*Schein* has no bearing on this case," the Second Circuit explained in *Gingras*, because it "dealt with an exception to the threshold arbitrability question—the so-called 'wholly groundless' exception—not a challenge to the validity of an arbitration clause itself." 922 F.3d at 126 n.3.

The defendants also propose that a prospective-waiver challenge is not a valid basis for invalidating a delegation clause. *See* Haynes Br. 27, 31–33 (suggesting that there could be no "deficiency with the delegation provision itself" because a

prospective-waiver argument may be addressed only to a contract "as a whole"). Once again, the circuits have specifically rejected precisely this argument. *See Hayes*, 811 F.3d at 671 n.1. And the contract in *Dillon* likewise contained the same delegation clause at issue here. *See Dillon*, 856 F.3d at 332 (quoting the Great Plains contract's statement that "any dispute" must be sent to arbitration).

More to the point: every court to consider this argument has come out the same way. *See, e.g.*, *Gingras*, 922 F.3d at 126 (invalidating delegation clause on the same basis as the entire arbitration contract); *MacDonald*, 883 F.3d at 226–27 (explaining that, "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions"); *Parm*, 835 F.3d at 1338; *Parnell*, 664 F. App'x at 843–44; *see also* ER11 (explaining that a delegation clause will not be enforced "if it results in enforcing an arbitration agreement that prospectively waives plaintiffs' statutory rights and remedies"). It is, of course, true that some delegation-clause challenges, like those related to costs, may require an evidentiary record. *See, e.g.*, *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90–91 (2000) (discussing "prohibitive costs" challenges to a delegation clause). That is not true, however, for challenges based on a contract's effort to strip consumers of their right to pursue statutory relief—which are resolved by looking to the contract itself.

And there can be no doubt that the consumers in this case expressly raised a specific attack on the delegation clause itself. In their brief opposing the defendants' motion to compel arbitration, they specifically challenged the delegation clause in the defendants' contract, arguing that it, too, was unenforceable under the FAA. *See* Plfs. Opp. to Dfs. Mot. to Compel, Dkt. # 102, No. 3:18-cv-01200 (N.D. Ca. Nov. 28, 2018) at 15–19 (separately challenging the delegation clause as unenforceable). That is all that's required to make the issue of the tribal-arbitration contract's enforceability one for the court. *See MacDonald*, 883 F.3d at 227 (holding that a party's "explicit references to the delegation clause are sufficient to contest it"); *Hayes*, 811 F.3d at 671 n.1 (noting that a specific challenge to the delegation clause in a tribal-arbitration contract "occasion[s] our review"); *see also Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017) (holding that an "express[]" assertion that a court must resolve the validity of an arbitration provision raises a challenge to a delegation clause "with sufficient force and specificity to satisfy *Rent-A-Center*" and explaining that "the absence of allegations in [a] complaint challenging the enforceability of the delegation provision has no bearing" on the issue).

### E. The district court's decision invalidating the contracts was not premature.

Next, the defendants make a play for delay. The district court's decision to invalidate the agreement was "premature," they say, because consumers might be

able to "effectively vindicate" their claims in arbitration. *See* Haynes Br. 46. In their view, rather than "speculat[e] about the effects the arbitration provisions would have on the[] claims." the parties (and the court) should allow an arbitrator to "definitively determine" the question. Haynes Br. 3, 48. As the defendants see it, an arbitrator could perform the same prospective-waiver and choice-of-law analysis just as easily as a district court. Haynes Br. 25 (arguing that an arbitrator, not a court, should decide any challenge and asserting that "the district court will retain jurisdiction over the case pending completion of arbitration").

This argument fails for a straightforward reason: the contracts unambiguously forbid the application of any relevant federal or state laws. There is, in other words, no speculation about what law the arbitrator must apply. That is why it is a nonstarter for the defendants to claim that the mere fact that the arbitration agreements select Native American law to the exclusion of state and federal law does not render their contracts invalid. As the Fourth Circuit has explained, a tribal-arbitration contract that states that it "shall be governed by the law of [a tribe]" and does not permit an arbitrator to "allow for the application of any law other than tribal law" operates as "as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." *Dillon*, 856 F.3d at 335–36 (emphasis in original). By selecting tribal law to the exclusion of state and federal law, the contracts here are facially invalid.

The defendants' position here, however, is flawed for another fundamental reason. Their claim (at 48) that a federal court will have an opportunity" to perform "back-end judicial review" of any arbitration is false. The contracts—by design—afford no possibility of any meaningful back-end review because they deprive a federal court of any power to even police an arbitrator's decision on the effect of the contract's unambiguous language stripping a consumer of her federal and state remedies. Consider: In *Mitsubishi Motors*, the Supreme Court explained that it might be appropriate in some cases for courts to wait until the award-enforcement stage before deciding a prospective-waiver challenge. *See* 473 U.S. at 637 n.19; *see also Dillon*, 856 F.3d at 335 (discussing that approach and rejecting it for tribal-arbitration contracts). Here, that review is impossible. By their terms, the contracts foreclose *any* federal court from reviewing an arbitrator's decision—they require that any arbitrator's decision "be filed with a Tribal court" and allow only that "it may be set aside by a Tribal court" and, even then, only if "the conclusions of law are erroneous under Tribal law." ER107, 118. There is no exception to this mandatory requirement. ER107, 118 (stating that the consumer "irrevocably consent[s] to the exclusive jurisdiction of the Tribal courts for purposes of this Agreement").

Standing alone, that is enough to invalidate these contracts. *See Vimar Seguros y Reaseguros*, 515 U.S. at 540–41 (cautioning that, where there is "no subsequent opportunity for review," a court should invalidate the contract if it operates as a

prospective waiver). As the Second Circuit explained in *Gingras*, it does not matter that a contract "provide[s] for arbitration to be conducted by an AAA or JAMS arbitrator" where "the mechanism of tribal court review hollows out those protections." 922 F.3d at 127. "Rather than the sharply limited federal court review of the arbitrators' decisions as constrained by the FAA, the review by tribal courts under these agreements hands those courts unfettered discretion to overturn an arbitrator's award." *Id.* at 127–28 (addressing an identical provision providing that any arbitral award "may be set aside by the tribal court upon judicial review"). Ultimately, a contract directing a tribal court to interpret its own law "effectively insulates the tribe from any adverse award and leaves prospective litigants without a fair chance of prevailing in arbitration." *Id.* at 128; *see also Jackson*, 764 F.3d at 779 (refusing to defer consideration until after arbitration because the contract "provides that a decision is to be made under a process that is a sham from stem to stern").

Given this, the defendants' claim that their contracts somehow preserve the applicability of the FAA should be rejected. Haynes Br. at 45 (arguing that litigants would have available to them "back-end judicial review" under section 10 of the FAA). As the Supreme Court has explained, a contract that attempts to override the "textual features" of the FAA by altering the scope of judicial review—for example, by permitting a court "to review for legal error"—is invalid. *See Hall St. Assocs., L.L.C.*

*v. Mattel, Inc.*, 552 U.S. 576, 585–86 (2008). The contracts here unavoidably run afoul of this basic rule.[7]

## II. Enforcing these contracts would invite a race to the bottom.

As we have explained, the past several years have seen a dramatic rise in payday lending enterprises seeking various ways "to skirt federal and state consumer protection laws under the cloak of tribal sovereign immunity." *Gingras*, 922 F.3d 128. "Part of this scheme involves crafting arbitration agreements like the ones here, in which borrowers are forced to disclaim the application of federal and state law in favor of tribal law." *Id.* at 126.

The contracts here straightforwardly represent one of these attempts. They not only effect an unambiguous and categorical waiver of federal and state statutory rights, but they also attempt to insulate that waiver from any meaningful federal-court review by prohibiting any court from considering it on the front end—through a delegation clause—and then on the back end—by requiring any review to occur in tribal court and only for legal errors under tribal law.

---

[7] The defendants have not asked this Court to sever the offending provisions in the contracts, and for good reason. As every court to consider the issue has explained, a tribal-arbitration contract's "errant provisions" are not severable because "the offending provisions go to the core of the arbitration agreement"—the "animating purpose[]" behind the contract is a "brazen" effort to ensure that the defendants "could engage in lending and collection practices free from the strictures of any federal law." *Hayes*, 811 F.3d at 675–76.

When confronted with these schemes, the federal courts have, with near unanimity, refused to endorse them. Seven times lenders have sought to enlist the aid of a federal circuit in enforcing tribal-arbitration contracts; seven times they have failed. The number of district courts that have rejected similar efforts is twice that. This consensus has delivered an unmistakable message: Tribal-arbitration contracts may not be enforced under the FAA because they are designed to "game the entire system" by deploying arbitration to avoid the state and federal law that would otherwise apply. *Hayes*, 811 F.3d at 676. In this way, they are not "on the up-and-up" and would, if enforced, turn the FAA into a vehicle for cynical attempts to opt-out of the legal rules that companies find inconvenient for their business model. *Id.* In the last three years—since Judge Wilkinson's path-marking decision in *Hayes*—federal courts have not permitted tribal lenders to enforce these illegal tribal-arbitration contracts.

There is no sound reason to depart from this consistent view. Over the years, courts have repeatedly rejected lender efforts to draft their way around the core defect of these contracts. *See Jackson*, 764 F.3d at 769 (rejecting contract requiring arbitration before "a Tribal Elder" or "a panel of three [] members of the Tribal Council"); *Hayes*, 811 F.3d at 670 (rejecting similar contract substituting the tribal elder requirement with arbitration before AAA or JAMS but requiring arbitrator to apply tribal law and disavowing federal law); *Dillon*, 856 F.3d at 335 (rejecting new version

omitting the explicit disavowal of federal law from the governing law clause). The defendants should not be rewarded for attempting to follow this same playbook. Accepting their argument for enforcement would make it trivially easy for lenders to draft their way around the "just and efficient system of arbitration intended by Congress when it passed the FAA." *Hayes*, 811 F.3d at 674. Because the contracts foreclose consumers from vindicating their statutory rights, they are not enforceable under the FAA.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
1900 L St. NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*

KRISTI C. KELLY
ANDREW J. GUZZO
KELLY GUZZO, PLC
3925 Chain Bridge Rd., Suite 202
Fairfax, Virginia 22030
(730) 424-7527

LEONARD A. BENNETT
CRAIG C. MARCHIANDO
ELIZABETH W. HANES
CONSUMER LITIGATION ASSOCIATES, P.C.

48

763 J. Clyde Morris Blvd., Suite 1A
Newport News, Virginia 23601
(757) 930-3660

ANNA C. HAAC
TYCKO & ZAVAREEI LLP
1828 L St. NW, Suite 1000
Washington, DC 20036
(202) 973-0900

February 3, 2020                    *Counsel for Plaintiffs-Appellees*

49

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this motion contains 11,947 words, excluding the parts exempted by Rule 32(f). This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*s/Matthew W.H. Wessler*
Matthew W. H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*s/Matthew W.H. Wessler*
Matthew W.H. Wessler